ANNA PETKUS, as Special Adm'r of the Estate of Joseph B. Petkus, Deceased, Plaintiff-Appellant, v. DANIEL V. GIRZADAS *et al.*, Defendants-Appellees (Christ Hospital of the Evangelical Hospital Association *et al.*, Defendants).

First District (3rd Division) No. 88—0979

Opinion filed December 7, 1988.—Rehearing denied January 6, 1989.

324

Robert F. Lisco, of Lisco & Field, of Chicago (Sidney Z. Karasik, of counsel), for appellant.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Michael C. Kominiarek and Russell P. Veldenz, of counsel), for appellees.

· JUSTICE McNAMARA delivered the opinion of the court:
Plaintiff Anna Petkus, as special administrator of the estate of her husband, Joseph B. Petkus, deceased, appeals from a trial court

order granting summary judgment in this medical malpractice action in favor of defendants, Drs. Daniel V. Girzadas, Robert A. Miller and Richard A. Sodetz, partners in Oak Lawn Orthopedics, S.C. The court granted summary judgment on the basis that plaintiff's sole expert witness, a cardiologist, could not provide the requisite expert opinion of the conduct of an orthopedic surgeon. Dr. Mary DiFilippo and Christ Hospital remain as defendants in the action.

The physicians' depositions reveal the following facts. On September 22, 1981, Dr. Miller, an orthopedist, admitted decedent to the hospital with a broken leg after he fell off a ladder. Decedent denied having a prior cardiology condition. The first stage of a surgical procedure was performed that day, and decedent remained in intensive care until the following day.

On September 24, decedent complained of chest pain. On September 25, decedent's EKG of the previous day was labeled abnormal. Dr. Miller called in Dr. DiFilippo, a cardiologist, as a consulting physician. Dr. DiFilippo diagnosed a myocardial infarction which could have occurred either in the hospital or prior to the hospitalization.

An October 4 EKG also showed the myocardial infarction. On October 5, Dr. Miller performed the second stage of surgery on the fractured leg. He did not recall having reviewed the October 4 EKG report prior to surgery.

On October 13, Dr. Miller wrote in decedent's chart that decedent would be getting up in a chair and beginning physical therapy. Dr. Miller testified that Dr. DiFilippo orally approved physical therapy twice daily. Dr. DiFilippo's October 13 chart notation states that at physical therapy decedent felt faint and his vision blackened. She cancelled further therapy for that day, but ordered its resumption the next day. She ordered: "Please get patient up in a chair today. No physical therapy today. Resume PT tomorrow, but only standing for a few moments, ambulating 5 to 10 feet. Increase gradually, daily, has not been out of bed for three weeks." She prescribed nitroglycerine and Maalox at his bedside.

At 2:10 p.m., Dr. Mendek ordered an EKG "stat" when decedent complained of heaviness in the chest after getting out of bed.

On the morning of October 14, decedent was returned to physical therapy, although the results from the previous day's EKG were not yet available.

At 1:30 p.m. on October 14, decedent was taken to physical therapy for the second time that day. Upon arrival, he complained of feeling warm. He was pale, perspiring, had short, rapid and shallow respiration, a blood pressure of 90 over 60 and a heart rate of 106. He

was returned to his room. At 3:30 p.m., decedent appeared gray and was perspiring, with blood pressure of 65 over 16. Decedent then suffered cardiac arrest. He died at 4:30 p.m.

Dr. Miller testified in an evidence deposition that he was responsible for decedent's orthopedic management and Dr. DiFilippo was primarily responsible for decedent's medical management. Dr. Miller performed the October 5 surgery without the benefit of the October 4 EKG results because he believed it was up to the internists to inform him if the surgery would not be safe. In regard to the October 13 physical therapy, Dr. Miller believed it was appropriate whether or not the patient had a heart problem. It was up to the internists to tell him otherwise. Dr. Miller found it acceptable to return decedent to physical therapy on October 14 without seeing the October 13 EKG results.

Dr. William H. Wehrmacher, a cardiologist, testified for plaintiff in an evidence deposition. Dr. Wehrmacher examined all decedent's medical records, including the records of defendants and Dr. DiFilippo. He also reviewed the autopsy report and the coroner's microscopic slides with a pathologist.

In Dr. Wehrmacher's opinion, there were deviations from the standard of care with respect to the medical care decedent received. Those deviations aggravated the natural history of decedent's heart disease and may have actually precipitated the final episode. Decedent clearly exhibited signs of coronary artery disease, and the medical care failed to adequately manage his cardiac condition in the hospital. Instead, he was repeatedly subjected to physical activities in excess of what his heart could withstand.

According to Dr. Wehrmacher, the appropriate standard of care for a post-operative patient with a cardiac condition required very limited, carefully monitored physical movement, particularly after the October 5 surgery. The October 12 EKG showed a substantial change and should have alerted the attending physicians to monitor the cardiac condition carefully. The October 13 EKG again showed dramatic changes. Dr. Wehrmacher criticized the fact that, while decedent may have suffered another myocardial infarction in physical therapy on October 13, nothing was done to assess it and decedent was returned to physical therapy twice more on October 14.

Dr. Wehrmacher opined that defendants were responsible for stopping physical therapy by October 13, if not before. Defendants should have withdrawn the physical therapy order entirely. They should have collaborated with the other treating physicians, including the cardiologist, to obtain sufficient information about the cardiac condition be-

fore ordering increased physical activity.

Dr. Wehrmacher also testified that he was not qualified to render an opinion about the actual orthopedic care rendered for the fracture.

The trial court reviewed the depositions of Drs. Miller and Wehrmacher, reviewed a portion of Dr. DiFilippo's deposition, and granted summary judgment in favor of the defendant orthopedic surgeons. The trial court found that, although Dr. Wehrmacher, plaintiff's only expert witness, criticized the orthopedists, he expressly denied acting as an expert with respect to those physicians. Plaintiff appeals.

■ Summary judgment should not be entered for defendants unless all of the evidence viewed in the aspect most favorable to the plaintiff so overwhelmingly favors defendants that no contrary verdict could ever stand. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) Summary judgment may be appropriate where plaintiff fails to establish the standard of care by means of an affidavit or deposition of a doctor. However, if reasonable persons could arrive at different conclusions, summary judgment should be denied. (*Smothers v. Butler* (1979), 78 Ill. App. 3d 1018, 398 N.E.2d 12.) Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.

■ Plaintiffs in medical malpractice cases must establish the standard of care against which the defendant doctor's conduct will be measured. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) Plaintiff must then prove that judged in light of those standards the physician was unskillful or negligent and caused plaintiff's injuries. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.) When there is a difference of opinion between expert witnesses as to the applicable standard of care in a particular case, the question becomes one for the jury. *Sheahan v. Dexter* (1985), 136 Ill. App. 3d 241, 483 N.E.2d 402.

■ In determining the proper standard of care, the applicable rule requires a physician to possess and to apply that degree of knowledge, skill and care which a reasonably well-qualified physician in the same or similar community would bring to a similar case under similar circumstances. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.) The expert must show he is familiar with the methods, procedures and treatment ordinarily observed by other physicians. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.

■ It lies within the sound discretion of the trial court to determine if the witness is qualified and competent to state his opinion as an expert regarding the standard of care. (*Purtill v. Hess* (1986), 111

Ill. 2d 229, 489 N.E.2d 867.) However, in this case we are considering Dr. Wehrmacher's qualifications only in terms of whether his deposition is sufficient to create an issue of fact in opposition to defendants' motion for summary judgment, and we are not predetermining the trial court's decision as to his competency to testify after these qualifications have been more thoroughly explored at trial. See *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.

■■ Medical malpractice cases differ as to the type of evidence required to sustain plaintiff's allegations. Many allege a physician's diagnostic error, or inadequate skill, knowledge or experience in his specialty or profession. Other cases, however, allege no diagnostic or skill error. Instead, as here, they allege the physician failed to exercise diligence in attending to his patient. (See, *e.g., Smothers v. Butler*, 78 Ill. App. 3d at 1023, citing Annot., *Liability of Physician for Lack of Diligence in Attending Patient*, 57 A.L.R.2d 364 (1958).) A malpractice suit may be based upon the negligence of a physician in failing to properly care for a patient after an operation. *Smothers v. Butler*, 78 Ill. App. 3d at 1023, citing *Church v. Adler* (1953), 350 Ill. App. 471, 113 N.E.2d 327; see also *Smith v. St. Therese Hospital* (1982), 106 Ill. App. 3d 268, 435 N.E.2d 939 (expert health planner qualified to testify about standard of care required of hospital although he was not a medical practitioner).

■■ Thus, where certain minimal uniform medical standards apply to a given medical situation regardless of the advanced specialty training of a doctor, the lack of familiarity with the advanced training of another physician is not relevant and will not disqualify an expert. Using similar reasoning, our supreme court recently held that where certain uniform medical standards apply to a given situation regardless of the locality, then the lack of familiarity with the practice in a particular locality will not disqualify the expert because that lack is not relevant. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.

Decedent died of congestive heart failure, not a broken leg. Defendants' skills, experience or knowledge as orthopedic surgeons are not relevant. Defendants' diagnosis or surgical treatment of decedent is not at issue. We are faced only with the narrow question of the competency of an expert witness to testify to minimum standards of *general* medical practice in the absence of familiarity with the standards of *specialized* orthopedic care. The expert's testimony should not be excluded where the standards to which he proposes to testify are minimum standards applicable to any physician rendering post-operative care to a cardiac patient. The facts sufficiently demonstrate that the standard of practice of such a physician is within Dr.

Wehrmacher's scope of knowledge.

 █ Dr. Wehrmacher testified that he is familiar with the methods and procedures for treating a post-surgical patient who also has a cardiac problem. An expert's opinion should be evaluated by the reasons given for the conclusion and the factual details marshalled in support thereof. (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289.) Dr. Wehrmacher examined the hospital records, physicians' notes, autopsy report and slides, and depositions of several defendants. He set forth the facts he found to be key in determining what type of post-surgical general medical care decedent should have received.

Dr. Wehrmacher testified that the condition of decedent's coronary arteries showed he had coronary artery disease for at least the last 5 to 10 days of his life. Acceptable standards of care required a diagnosis or at least suspicion of this disease during that time period. Following Dr. DiFilippo's September 25 note that decedent had suffered an acute anteroseptal myocardial infarction, the subsequent care "failed to give adequate attention to the natural history of myocardial infarction and that the patient was not given either adequate surveillance or management in that period." Instead, despite his complaints, decedent was subjected to activities in excess of what he could tolerate.

Dr. Wehrmacher believed that the October 5 surgery placed an additional strain on decedent's heart and it was thus "unacceptable" to permit so much activity following that surgery because it was too soon after the heart attack. The appropriate standard of care required very limited patient activity. Decedent should not have been allowed to sit up in a chair for another 7 to 10 days. Walking should have been allowed only after he could sit up with no adverse effect and if increased activity was gradual and only then if monitoring of his vital signs showed that he tolerated the increased activity "perfectly."

Dr. Wehrmacher opined the October 12 and 13 EKGs showed that when decedent was taken to physical therapy on October 13 "he tolerated it very badly." Dr. Wehrmacher based his opinion on the record showing decedent took only two steps in physical therapy, became faint, vomited, and was returned to his room on a cart with the help of three people. He may have experienced another myocardial infarction at this time, although nothing was done to assess whether this had occurred.

Dr. Wehrmacher stated that the applicable standard of care required immediate withdrawal of decedent from all possible stressful activity and the making of detailed inquiries regarding the "very dis-

turbing episode" in physical therapy. It would be necessary to modify his activities in recognition that a recurrence would be life threatening, and to place decedent on continuous EKG monitoring for three to five days, preferably in intensive care.

The October 13 EKG was totally inadequate in duration. Notwithstanding that, additional signs exhibited by decedent while alive revealed the congestive heart failure. These included his October 13 complaints of sternal pain and heaviness in his chest upon getting out of bed; the EKG after the September 25 heart attack; and his last EKG, which showed arrhythmia or rhythm disturbances.

Dr. Wehrmacher opined that defendants deviated from the standard of care. In his opinion, defendant orthopedic surgeons erred in prescribing physical therapy. "[T]hey should have been responsible to have stopped it before the disaster ***." Physical therapy should have been stopped by October 13, if not before. Following the first incident in physical therapy, the surgeons should have withdrawn the physical therapy order totally. The orthopedic surgeons had the responsibility of collaborating with other treating physicians. Knowing of the previous myocardial infarction, defendants violated the standard of care in even initiating physical therapy without interacting more with internal medicine specialists.

We hold that Dr. Wehrmacher's deposition is sufficient to withstand defendants' motion for summary judgment. Plaintiff has demonstrated an ability to offer, through a competent expert witness, evidence at trial on the applicable standard of medical care. (See *Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.) The trial court erred in allowing defendants' motion for summary judgment.

Defendants argue that an orthopedic surgeon does not become "just another doctor" after surgery. Instead, he has specialized skills and knowledge "which he must apply to all aspects of patient care." We note that Dr. Miller did not state in his deposition that he used this "specialized skill" to determine whether or not decedent could tolerate an increase in physical movement. Instead, he deferred completely to the internists. It is precisely this deference and relinquishment of his shared responsibility that Dr. Wehrmacher criticizes. Thus, while defendants argue that plaintiff must establish "the knowledge and skill of an orthopedic surgeon in handling a cardiac condition," defendants also maintain that the requisite orthopedic skill merely consists of letting the nonorthopedic doctors handle the cardiac condition.

Defendants' reliance on *Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53, is misplaced. In *Stevenson*, the defendant ear,

nose and throat specialist failed to diagnose and treat a suspected case of temporal arteritis. Plaintiff deposed only one physician, an eye doctor, who had never seen an actual case of temporal arteritis and had no opinion as to whether defendant's treatment fell below the acceptable medical standard of care. In the present case, the diagnosis and treatment restricted to defendants' narrow speciality is not at issue. Instead, the alleged negligence stemmed from defendants' broader, general post-operative medical care of decedent. *Lawrence v. Rubio* (1980), 85 Ill. App. 3d 472, 406 N.E.2d 946, is also unpersuasive. In *Lawrence*, plaintiff presented expert testimony which was actually favorable to defendant.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings consistent with the findings contained herein.

Judgment reversed and cause remanded.

WHITE, P.J., and FREEMAN, J., concur.