JOSEPH McGOWAN, a Minor, by Kathleen McGowan, his Mother and Next Friend, Plaintiff-Appellant, v. CARLOS E. TORRES, Defendant-Appellee (MacNeal Memorial Hospital *et al.*, Defendants).

First District (3rd Division)   No. 1—87—0631

Opinion filed June 7, 1989.

McNAMARA, J., specially concurring.

Sidney Robin, Ltd., of Chicago, for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Francis Raymond Petrek, Jr., and Mary K. Periolat, of counsel), for appellee.

JUSTICE RIZZI delivered the opinion of the court:

This is a medical malpractice action brought against defendants Carlos E. Torres, M.D., Angel C. Lugay, M.D., Robert C. Olson, executor of the estate of James Olson, M.D., deceased, Manohar L. Jethani, M.D., and MacNeal Memorial Hospital Association. Plaintiff's complaint alleges that he suffered serious brain damage because the defendants failed to properly diagnose and treat his bacterial meningitis. Defendants Torres and Lugay, who practiced together as pediatricians, filed a motion for summary judgment. Doctor Lugay subsequently withdrew his motion. Affidavits, deposition transcripts, interrogatories, and other documents were filed by the parties. The trial court granted defendant Torres' motion for summary judgment and plaintiff appeals. The other named defendants remain as parties to this action. We reverse and remand.

Plaintiff, Joseph McGowan, was born November 25, 1978. On November 29, 1979, he was hospitalized at MacNeal Memorial Hospital. For the duration of this hospital stay, Joseph was under the care of Dr. Olson, who discharged him on December 3, 1979.

On December 4, 1979, Dr. Torres examined Joseph at the office which he shared with Dr. Lugay. His examination revealed that Joseph was suffering from vomiting, diarrhea and fever of unknown origin. Dr. Torres ordered a blood and urine test, and examined Joseph to determine whether or not he was exhibiting any of the physical signs of meningitis such as stiff neck or extremities. According to Dr. Torres these tests were negative.

On December 5, 1979, Joseph's parents took him to the emergency room of MacNeal Memorial Hospital. The emergency room records indicate that Joseph was still suffering from vomiting and fever. Neither Dr. Torres nor Dr. Lugay saw Joseph on the day of his emergency room visit. Joseph was examined by the pediatric resident on duty and readmitted to MacNeal Memorial Hospital on December 5. Doctors Torres and Lugay were listed as his attending physicians. Dr. Torres examined Joseph in the hospital on December 6. He thereafter noted in the medical record that Joseph was doing fine. Dr. Torres saw Joseph again on December 8 and noted that he was "doing much better." He also ordered a urine culture test. On December 9, Dr. Torres saw Joseph and noted that he was suffering from diarrhea. He prescribed some medication, a soft diet and requested that a stool culture be performed. On December 11, Joseph was discharged from the hospital by Dr. Lugay. Dr. Torres wrote the discharge summary which indicated that Joseph was suffering from viral gastroenteritis. On December 18, 1979, Dr. Torres performed a follow-up examination of Jo-

seph in his office. He noted that Joseph was doing much better and that his physical examination was normal. Dr. Torres did not see Joseph again after his visit.

In May of 1980, Joseph exhibited symptoms of speech and language delay. His parents also reported that Joseph was having episodes of high temperature and hyperactivity. In September of 1980, Joseph was suffering from behavioral problems and screaming spells. By October of 1986, Joseph was diagnosed as severely physically and mentally disabled. According to Dr. Robert Mendelsohn, a medical expert hired by the plaintiffs, Joseph's medical condition was the result of brain damage caused by untreated bacterial meningitis.

Kathleen McGowan filed the malpractice action on behalf of her son Joseph. After the lawsuit was filed, Lugay and Torres had a pediatrician review the medical records concerning Joseph's hospitalization and treatment. The defendants' expert opined that the treatment rendered by Doctors Lugay and Torres was consistent with the generally accepted standards of patient care for the greater Chicago area.

Plaintiff had the medical records examined by her medical expert who stated that in his opinion the care and treatment rendered by the defendants was not consistent with the generally accepted standards of patient care for the greater Chicago area. Dr. Robert Mendelsohn stated that Doctors Lugay and Torres should have performed a spinal tap to test for meningitis at the beginning of Joseph's December 5, 1979, hospitalization. After reviewing the affidavits, depositions, and hearing oral argument, the trial court granted Torres' motion for summary judgment. This appeal followed.

The sole issue before us is whether there is a genuine issue of material fact as to the liability of Torres for the failure to diagnose and treat Joseph's bacterial meningitis during his December 5, 1979, hospital admission.

■■ Summary judgment is appropriate if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (*Lane v. City of Harvey* (1988), 178 Ill. App. 3d 270, 273, 533 N.E.2d 75, 78; Ill. Rev. Stat. 1985, ch. 110, par. 2–1005(c).) Evidence in support of the motion must be strictly construed against the moving party and summary judgment should be denied where reasonable persons could arrive at different conclusions. (*Petkus v. Girzadas* (1988), 177 Ill. App. 3d 323, 327, 532 N.E.2d 333, 336.) An order granting summary judgment must be reversed if a reviewing court determines that an issue of material fact exists. *Arnold v. Village of Chicago Ridge* (1989), 181

Ill. App. 3d 778, 785.

■ After reviewing the pleadings and the documents strictly against Torres, we conclude that a genuine issue of material fact remains. Doctors Torres and Lugay were Joseph's attending physicians during his December 5, 1979, hospitalization. Reasonable persons could draw different conclusions as to who was responsible for the failure to diagnose and treat Joseph's bacterial meningitis during that hospital admission. Thus, a triable issue of fact exists as to the liability of defendant Torres, which precludes summary judgment.

The summary judgment in favor of defendant Torres is, therefore, reversed and the case is remanded to the trial court for further proceedings.

Reversed and remanded.

WHITE, J., concurs.

McNAMARA, J.,* specially concurs.

JUSTICE McNAMARA, specially concurring.

I agree with the majority holding that triable issues of fact remain as to Dr. Torres' liability. However, I believe it would better assist the trial court on remand if the supporting facts found in the record were detailed, particularly because the briefs here and the arguments before the trial court skimmed over or distorted those facts.

Defendant Dr. Torres relies almost exclusively on his serious mischaracterization of Dr. Mendelsohn's testimony. Dr. Torres argues that Dr. Mendelsohn opined the only negligence was failure to order a spinal tap on the single day of December 5, 1979, and that Dr. Mendelsohn testified Dr. Torres was not obligated "to order a spinal tap for the child at a later date."

Counsel did preface several questions with the preposition and date, "on December 5, 1979." However, throughout the entire record, the parties, witnesses and attorneys consistently used the phrase "December 5th *admission*" to mean the *entire* hospitalization period from December 5 through December 11. Dr. Mendelsohn does not separate the 24 hours comprising December 5 from the remainder of the hospital stay. Dr. Mendelsohn uses phrases such as "in December the 5th admission"; "in that hospitalization"; "the second admission"; "dur-

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.

ing either of his admissions"; and "until the December admission."

The attorneys used similar phrases: "during the admission of 12-5-79"; "during the child's second admission of December 5, 1979"; "the hospitalization of 12-5-79"; and "during that hospitalization." Thus, it is grossly inaccurate to narrow the focus of Dr. Mendelsohn's testimony to December 5.

Most significantly, Dr. Mendelsohn focused heavily on the duration and continuing nature of the illness. He opined that each passing day caused further brain damage. Dr. Mendelsohn's notes and testimony consistently reflect his opinion that the "lumbar puncture should have been done in that [second] hospitalization." He never limits the time for performing the lumbar puncture to the single day of December 5. Notably, he believed that even as late as the discharge date of December 11 a spinal tap would have revealed the proper diagnosis and prevented the irreversible brain damage. "[On December 11] he still had meningitis, [and] *even at that time* had a spinal tap been done, it would have shown meningitis." (Emphasis added.)

Dr. Mendelsohn explained that the symptoms "went on from November the 23rd to December the 5th. That's pretty long." Any time after that, defendants should have known a spinal tap was essential. "[A]fter you get *much past a week* or even less than a week with those kinds of symptoms going on *** that's the time to do a spinal tap. Every book says the same thing." (Emphasis added.) Dr. Mendelsohn repeatedly emphasized that the disease caused progressive brain damage. It was not a case of, *e.g.*, a single blow to the head causing irreversible brain damage at the moment of impact.

The overall record shows Dr. Mendelsohn restricted the critical time to December 5 only as to preventing "further" or even "any" brain damage:

> "Q. At what point do you feel that proper antibiotic treatment could have prevented *any* brain damage?
>
> A. Well, I think that the antibiotic treatment if given on the 5th would have prevented *further* brain damage." (Emphasis added.)

Thus, a spinal tap should have been done "right at the beginning" of that hospitalization. December 5 was the *earliest* Dr. Mendelsohn believed the applicable standard of care mandated a spinal tap. December 5 was not by any means the only or the latest date on which a lumbar puncture was medically indicated. Joseph simply did not suffer "any irreversible brain damage" prior to December 5, but progressively suffered damage each day following December 5.

> "Dr. Mendelsohn: *** [H]e didn't suffer any brain damage be-

fore he had the severe period of irritability and lethargy. I would say that at that point the brain damage began \*\*\*.

I think that the brain damage that *started* on the 5th *continued to progress* and that's what was responsible for his later symptoms.

Q. Is it your belief \*\*\* [that this child] was undergoing *a continuing process* of brain damage because of \*\*\* meningitis?

A. Sure, sure, because that is not at all unusual." (Emphasis added.)

Thus, the trial court erred in its finding that "Dr. Mendelsohn clearly testified that Dr. Torres was negligent only if he participated in the December 5th admission to the plaintiff." In fact, Dr. Mendelsohn's affidavit, opining that based on a reasonable degree of medical certainty Dr. Torres' care of Joseph was not consistent with the applicable standard of patient care, and his deposition testimony cited here strongly contradict defendants' expert's opinion that Dr. Torres met the standard of care.

Dr. Torres maintains that Dr. Mendelsohn erroneously believed Dr. Torres was responsible for the actual decision to admit Joseph to the hospital on December 5. Dr. Mendelsohn did not limit the responsibility of defendants to one day. As already shown, when Dr. Mendelsohn said he held Drs. Torres and Lugay "both responsible for that December 5th admission," he was referring to the entire hospital stay. This conclusion is strongly corroborated by the testimony of Drs. Torres and Lugay.

On December 4 Dr. Torres understood that both he and Dr. Lugay were assuming the care of Joseph. "The responsibility was on both." The complaint alleges that Dr. Torres had Joseph under his care and treated Joseph after November 1979. Dr. Torres agreed. He testified that he was treating Joseph throughout December 1979, starting December 4. Dr. Lugay also agreed: "We both had primary responsibility" for Joseph during his hospital stay. "We have an equal familiarity and responsibility."

Significantly, on December 5 Dr. Lugay notified Dr. Torres of Joseph's admission to the hospital. They discussed Joseph and other patients, "telling each other the follow-up, what was going on in the hospital," according to Dr. Torres. Dr. Torres reviewed the history and admission notes before seeing Joseph on December 6, along with the hospital records for the first admission, indicating the duration of the illness. Dr. Torres wrote orders for tests, diet changes and medication during the hospital stay, and wrote the discharge report. Dr. Torres also implied that both doctors were equally responsible for

identifying signs of meningitis: "We did not have *** any other neurological symptoms that two experienced pediatricians would have picked up at the time."

Summary judgment in favor of Dr. Torres was inappropriate.