ELAINE ROSENBERG, Plaintiff-Appellant, v. JERALD MILLER, Defendant-Appellee.

Second District No. 2—92—0700

Opinion filed July 23, 1993.

Susan M. Lampert, of Rosenberg & Rosenberg, P.C., of Chicago (Anthony J. Basile, of counsel), for appellant.

Michael J. Cucco and Lynn D. Dowd, both of Cassiday, Schade & Gloor, of Chicago (Morgan A. Milne, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Elaine Rosenberg, filed a medical malpractice claim against defendant, Dr. Jerald Miller, a periodontist. Plaintiff contended that defendant's failure to diagnose an infected and impacted wisdom tooth had caused paresthesia (numbness) in the lower right side of her face. The trial court granted defendant's motion for summary judgment. Plaintiff appeals, arguing that the trial court erred in granting defendant's motion for summary judgment and that the trial court erred in finding plaintiff's expert witness was not qualified to testify as to the applicable standard of care.

The depositions of dentists who provided treatment to plaintiff serve as the evidentiary basis of the appeal. Between 1966 and 1991, plaintiff was treated by four dentists: Drs. Shapiro, Lubar, Gaule and

Volk. Dr. Abraham Shapiro testified that he first saw plaintiff on January 20, 1966, at which time he took full mouth X rays of plaintiff. These X rays showed that tooth No. 32 (a wisdom tooth) was impacted. Dr. Shapiro did not find this significant, as many people have impacted wisdom teeth which are not bothering them. In April 1973, Dr. Shapiro incised the tooth immediately adjacent to and in front of tooth No. 32, so that it could drain. Plaintiff was given antibiotics to reduce infection.

In June 1979, X rays taken by Dr. Shapiro showed that claimant's No. 32 tooth was completely impacted. Dr. Shapiro noted in his records that plaintiff was referred to Dr. Robinson, an oral surgeon, for treatment of the impacted tooth. He had no knowledge of whether plaintiff went to Dr. Robinson for treatment. In the three years following this June 1979 appointment, Dr. Shapiro saw claimant six times. In or about March 1982, he received a full set of X rays from defendant. In reviewing plaintiff's X rays, Dr. Shapiro could see that tooth No. 32 had become more visible and that it had become encapsulated. Dr. Shapiro last treated plaintiff in 1982.

Dr. Jeffrey Gaule testified that he was a general dentist, licensed to practice dentistry since 1980. He stated that periodontists specialize in diseases and treatments of the gums and the supporting bones. To become a periodontist requires several years of post-graduate education. A periodontist is qualified to do general dentistry, but normally elects not to do so. Dr. Gaule first saw plaintiff in June 1983. At that initial examination, plaintiff had no specific dental complaints regarding her wisdom teeth. Dr. Gaule was not certain if plaintiff had been referred to him by another dentist. He did not take X rays of plaintiff's mouth on this first visit. Dr. Gaule stated that it was a common practice not to take X rays if a patient has current X rays from another dentist. Over a three-year period, he saw plaintiff nine times but never took X rays of her mouth. Dr. Gaule never worked on tooth No. 32, and plaintiff never made any complaints about this tooth.

On August 9, 1984, defendant sent Dr. Gaule a letter stating that tooth No. 19 needed work. Apparently, that was the first time Dr. Gaule knew that plaintiff was being treated by defendant. Dr. Gaule never received X rays from defendant, nor did he request them. In his records pertaining to plaintiff, he had one X ray. Dr. Gaule did not know how he obtained this X ray.

On cross-examination, Dr. Gaule stated that he never saw Dr. Shapiro's records of plaintiff. During his initial examination of plaintiff, he performed both intra-oral and extra-oral exams. He did not take X rays because plaintiff said she would provide a set of recent

X rays. He did not check plaintiff's wisdom teeth and was not aware of the presence of any impacted wisdom teeth. Dr. Gaule never discussed plaintiff's wisdom teeth with her.

In his evidence deposition, Dr. Richard Volk testified that in 1979 he was licensed to practice dentistry in Illinois. He is a general dentist, who refers periodontal work to a number of specialists. On February 20, 1987, plaintiff, whose husband was a patient of Dr. Volk's, was first seen by Dr. Volk. Prior to this examination, defendant had told plaintiff that she needed root canal work to drain pus at tooth No. 31. At this initial examination, plaintiff brought a single X ray taken by defendant. Dr. Volk did not know why she did not return to Dr. Gaule for further dental work. On this date, Dr. Volk took full mouth X rays of plaintiff. Upon reviewing same, Dr. Volk concluded that he was unable to provide treatment to plaintiff, whose condition exceeded his expertise. Specifically, Dr. Volk stated:

"Because she had a wisdom tooth growing through the angle of the ramus, there was a huge [cyst] in the area, the pus was draining out from the distal of No. 31 and because of the [cyst] or the black space in that area showing me that there is tremendous amount of bone loss, at any time she could have a fracture of the jaw and I don't want an endodontist or root canal specialist *** to start playing with the root canal when there was such a severity the [plaintiff] didn't seem to know about and nobody seemed to bring it up."

Dr. Volk described to plaintiff the seriousness of the situation, explaining that a mere root canal procedure would not suffice. He referred her to an oral surgeon, Dr. Robert Lubar. Following surgery performed by Dr. Lubar in March 1987, Dr. Volk saw plaintiff a number of times for general dentistry purposes. As of his deposition, he had last seen plaintiff on November 11, 1989. At that time, she was complaining of paresthesia (loss of sensation to sensory nerves) on the lower right side of her face, which caused lack of feeling and involuntary drooling out of the right corner of her mouth.

When asked about defendant's treatment of plaintiff, Dr. Volk offered the following criticisms. First, he opined that defendant failed to read properly the X rays so that he did not diagnose the pathology related to tooth No. 32. This failure to diagnose occurred at two distinct points in defendant's treatment of plaintiff. First, defendant took full mouth X rays of plaintiff in March 1982. He failed to see a cyst approximately five millimeters in size around the base of tooth No. 32. In 1987, defendant again took X rays of plaintiff's mouth and gave one of the X rays to plaintiff to take to Dr. Volk. This X ray

showed that the cyst was about 15 times larger than it was in March 1982. Prior to plaintiff's seeing Dr. Volk, defendant told plaintiff that tooth No. 31 needed a root canal operation. In actuality, tooth No. 32 was the infected tooth, and it required a much more serious procedure than a root canal. If defendant had made a proper diagnosis of plaintiff's condition, it would have appeared in defendant's records.

Dr. Volk stated that plaintiff's condition was obvious and that *any* dentist, a general practitioner or specialist, should have picked it up from the X rays taken in March 1982. Having failed to make a proper diagnosis based on the X rays, defendant did not inform plaintiff of her situation and failed to make a timely referral to a proper dental specialist.

Further, as a result of his failure to read the dental X rays, defendant failed to prevent the increase in the cyst from 5 millimeters in March 1982 to 75 millimeters in 1987.

Dr. Volk concluded that defendant's treatment of plaintiff regarding the cyst at tooth No. 32 did not meet the applicable standard of care. In so finding, Dr. Volk stated that defendant's dental speciality did not insulate him from the requirement of correctly reading a patient's X rays for abnormalities and making appropriate referrals.

Further, when asked what might have caused plaintiff's paresthesia, Dr. Volk stated:

> "Possibly when you left the tooth over—I am just looking at the X-rays from '82 to '87, the [cyst] or the abscess continued to grow and eat away at the bone. Upon the removal of the tooth there could be damage to the interior alveolar nerve or to the surrounding bone areas and that could possibly lead to paresthesia, and the longer you wait possibly the more your chances are."

Dr. Robert Lubar testified that he first examined plaintiff on March 3, 1987. X rays demonstrated "an impacted wisdom tooth which was displaced inferiorly toward the inferior border of the mandible with a radiolucent area surrounding [tooth No. 32]." Also, Dr. Lubar was concerned about the potentiality of plaintiff pathologically fracturing her mandible. He informed plaintiff that an operation on the tooth could result in paresthesia and/or a fracture of the mandible. On March 4, 1987, he operated on plaintiff, removing both teeth Nos. 31 and 32. Further, he extricated a cyst located at tooth No. 32.

Dr. Lubar described the cyst as a "sac that's filled with fluid and it is lined by an epithelial tissue that has the potential to grow over a period of time and displace normal anatomical structures in its path." If left unchecked, a cyst will destroy the underlying bone to make

room for its own expansion. The cyst was initially formed due to the breakdown of the growth capsule surrounding tooth No. 32. The cyst removed from plaintiff's mouth was approximately an inch and a quarter across.

At some point following the surgery, plaintiff developed paresthesia. Dr. Lubar first knew of this condition when plaintiff returned to him for treatment in November 1991. At that time, plaintiff also was experiencing what she described as movement of her teeth. Dr. Lubar performed a clinical neurological test on plaintiff and determined that she had paresthesia of the right inferior alveolar nerve. He was not aware of any conditions occurring between the surgery performed in 1987 and the 1991 examination which would have caused plaintiff's paresthesia.

When asked whether the failure to remove the tooth and cyst in 1982 caused plaintiff's paresthesia, Dr. Lubar answered as follows:

"The position of that wisdom tooth was such that reasonable surgery could not have avoided the paresthesia. God positioned that wisdom tooth at the inferior border of the mandible or at some height in the mandible and it may have been moved lower because of the cyst over a period of time. But the removal of that cyst and tooth was going to create a paresthesia no matter when it was done."

He then conceded that the development of the cyst between 1982 and 1987 may have had something to do with plaintiff's paresthesia. He further admitted that the risk of paresthesia was heightened by the cyst's size.

Dr. Lubar was unable to read the X rays taken by defendant in 1982 so that he could definitely discern the cyst's dimensions. Dr. Lubar pointed out that it would have been prudent if, in 1982, defendant would have taken panaflex X rays of plaintiff's mouth. These X rays are "survey film[s] of the entire maxillar and mandible which would show the teeth and all the surrounding bone areas." Finally, Dr. Lubar testified that *any* licensed dentist can read an X ray.

Plaintiff first argues that the trial court erred in finding that her expert witness, Dr. Richard Volk, was not qualified to testify regarding the applicable standard of dental care. Defendant maintains that a periodontist's care cannot be evaluated by a general dentist.

To establish negligent medical malpractice, the plaintiff must prove the proper standard of care by which to measure the defendant practitioner's conduct, a negligent breach of that standard, and a resulting injury proximately caused by practitioner's lack of skill or care. (*Gorman v. Shu-Fang Chen, M.D., Ltd.* (1992), 231 Ill. App. 3d

982.) Except where negligence is so grossly apparent or within the everyday knowledge of a lay person, expert testimony is required to establish the standard of care applicable to the defendant practitioner and a breach of that standard. *Gorman,* 231 Ill. App. 3d at 986.

Section 8—2501 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 8—2501) states the qualifications for expert witnesses in medical malpractice actions. Section 8—2501 provides:

> "In any case in which the standard of care given by a medical profession is at issue, the court shall apply the following standards to determine if a witness qualifies as an expert witness and can testify on the issue of the appropriate standard of care.
>
> (a) Relationship of the medical specialties of the witness to the medical problem or problems and the type of treatment administered in the case;
>
> (b) Whether the witness has devoted a substantial portion of his or her time to the practice of medicine, teaching or University based research in relation to the medical care and type of treatment at issue which gave rise to the medical problem of which the plaintiff complains;
>
> (c) whether the witness is licensed in the same profession as the defendant; and
>
> (d) whether, in the case against a nonspecialist, the witness can demonstrate a sufficient familiarity with the standard of care practiced in this State." (Ill. Rev. Stat. 1989, ch. 110, par. 8—2501.)

The determination of whether a licensed physician is qualified to testify as a medical expert in a malpractice action is a matter resting within the sound discretion of the trial court. *Smock v. Hale* (1990), 197 Ill. App. 3d 732, 739.

The thrust of Dr. Volk's testimony is that defendant failed to read properly the X rays taken in 1982. If defendant had made a correct reading of the 1982 X ray, he would have noted a pathological condition at tooth No. 32. Having failed to make a proper reading, defendant did not make a prompt referral to an oral surgeon for the removal of the impacted tooth and the cyst which had formed at its base. Dr. Volk stated that all dentists, or those having a specialty, must be able to read accurately X rays and, if necessary, make referrals to the proper dental specialist based on those readings. Dr. Lubar echoed this view when he testified that *any* licensed dentist can read X rays.

In support of her argument, plaintiff cites *Gorman v. Shu-Fang Chen, M.D., Ltd.* (1992), 231 Ill. App. 3d 982, and *Petkus v. Girzadas*

(1988), 177 Ill. App. 3d 323. Though both of these cases dealt with medical rather than dental treatment, they provide sufficient guidance to this court.

In *Gorman*, a medical malpractice case against an orthopedic surgeon, the issue was whether a plastic surgeon was competent to testify to minimum standards of general medical practice in the absence of his familiarity with the standards of specialized orthopedic care. The *Gorman* defendant allegedly failed to diagnose plaintiff's medical condition (a fractured jaw) and to call in the appropriate specialist, which resulted in plaintiff undergoing extensive surgery. The *Gorman* court held that the plastic surgeon was competent to testify as to the applicable standard of care. The court found that the proposed expert, as a surgeon, had training and experience in treatment of fractures of the jaw and that "[his] educational and employment background insured his familiarity with the medical issues involved in this action and qualified him to testify under section 8—2501." *Gorman*, 231 Ill. App. 3d at 988.

The *Gorman* court relied heavily on *Petkus v. Girzadas* (1988), 177 Ill. App. 3d 323. In *Petkus*, plaintiff's expert was a cardiologist, who testified that defendant's post-operative treatment of the decedent violated the applicable standard of care. The defendant orthopedic surgeon contended that the plaintiff's expert could not provide the requisite expert opinion of an orthopedic surgeon's conduct. In deciding this issue, the *Petkus* court adroitly observed:

> "Decedent died of congestive heart failure, not a broken leg. Defendants' skills, experience or knowledge as orthopedic surgeons are not relevant. Defendants' diagnosis or surgical treatment of decedent is not at issue. We are faced only with the narrow question of the competency of an expert witness to testify to minimum standards of *general* medical practice in the absence of familiarity with the standards of *specialized* orthopedic care. The expert's testimony should not be excluded where the standards to which he proposes to testify are minimum standards applicable to any physician rendering post-operative care to a cardiac patient. The facts sufficiently demonstrate that the standard of practice of such a physician is within [plaintiff's expert's] scope of knowledge." (Emphasis in original.) *Petkus*, 177 Ill. App. 3d at 328-29.

■ Here, similar to *Gorman* and *Petkus*, the standard of care relates to *general* dental practice rather than defendant's speciality of periodontistry. Both Dr. Lubar and Dr. Volk stated that reading X rays is a matter of general dentistry. At issue is whether defendant

negligently read the X rays taken of plaintiff in 1982 and whether defendant was negligent in failing to refer plaintiff to an oral surgeon for removal of tooth No. 32 and the cyst at its base. There is no dispute regarding defendant's periodontal treatment of plaintiff's gums.

We find that Dr. Volk met the applicable standards set forth in section 8—2501. Consequently, we hold that the circuit court erred in ruling that Dr. Volk was not competent to testify regarding the applicable standard of care.

The final issue before this court is whether the trial court erred in granting defendant's motion for summary judgment on the issue of causation.

In *Purtill v. Hess* (1986), 111 Ill. 2d 229, our supreme court stated:

> "Because the purpose of a summary judgment proceeding is to determine whether there are any genuine issues of triable fact [citation], a motion for summary judgment should be granted only when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citations.] While use of the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit [citation], it is a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt." (*Purtill*, 111 Ill. 2d at 240.)

Moreover, in *Carter v. Dunlop* (1985), 138 Ill. App. 3d 58, this court stated:

> "[P]arties opposing summary judgment are not required to prove their case at the summary judgment stage, [but] they must provide a factual basis which would arguably entitle them to judgment. [Citation.] On a defendant's motion for summary judgment, plaintiff has an affirmative duty to bring forth all facts and evidence of a cognizable cause of action. [Citation.] Summary judgment is [only] appropriate where purported issues of material fact are not further supported by evidentiary facts or affidavits." (*Carter*, 138 Ill. App. 3d at 69.)

Further, close questions on disputed issues should not be decided as a matter of law but are best left for juries. *Pruitt v. Schultz* (1992), 235 Ill. App. 3d 934.

Defendant essentially argues that in this summary judgment proceeding plaintiff has the burden of proving causation by a preponderance of the evidence. That is not the standard; neither side has a bur-

den of proof in a motion for summary judgment. Rather, as stated above, plaintiff must provide a factual basis which arguably entitles her to judgment.

██ In the instant appeal, the depositions of Drs. Volk and Lubar form the basis of a cognizable cause of action. Dr. Volk opined that defendant had breached the applicable standard of dental care by failing to read properly the X rays taken in March 1982 and, further, failing to refer plaintiff to an oral surgeon for the removal of tooth No. 32 and the cyst (then five centimeters in size) at the base of the tooth. Dr. Volk stated that the delay in removing the tooth and cyst could possibly have led to plaintiff's paresthesia. Also, Dr. Lubar, whose testimony is admittedly contradictory, stated that plaintiff's paresthesia could have been related to the size of the cyst (an inch and a quarter) in 1987. Thus, there is evidence supporting plaintiff's contention that defendant's failure to diagnose her condition in 1982 and to make a proper referral caused her paresthesia.

We find that this is a close issue which should not be decided as a matter of law; it is best left for the trier of fact to decide.

For the foregoing reason, we reverse the judgment of the circuit court and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded with directions.

GEIGER and DOYLE, JJ., concur.