CAROL McWILLIAMS *et al.*, Plaintiffs-Appellants, v. DONALD DETTORE *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—07—0678

Opinion filed January 20, 2009.

WOLFSON, J., specially concurring.
GORDON, ROBERT E., P.J., dissenting.

Ronald S. Fishman, of Fishman & Fishman, Ltd., of Chicago, for appellants.

Mark J. Smith, Joan M. Kublanza, Scott R. Wolfe, and Mehreen S. Sherwani, all of Lowis & Gellen, LLP, of Chicago, for appellee Donald Dettore.

Krista R. Frick and Luisa F. Trujillo, both of Bollinger, Ruberry & Garvey, of Chicago, for other appellees.

JUSTICE GARCIA delivered the opinion of the court:

In this medical negligence case, Carol and Robert McWilliams appeal the circuit court's orders finding their expert, Dr. Hector Gomez, a hematologist/oncologist, not qualified to give standard of care testimony against Dr. Christopher D. Joyce, a surgeon. The plaintiffs also contend the circuit court abused its discretion in denying their motion to voluntarily dismiss their case against both Dr. Joyce and the primary care physician, Dr. Donald Dettore, after the circuit court granted Dr. Joyce's motion *in limine*, when the jury had already been selected and sworn. We affirm.

## BACKGROUND

The suit against Dr. Dettore and Dr. Joyce, individually and as an agent for Suburban Surgical Associates (SSA),[1] alleged they negligently failed to diagnose Mrs. Carol McWilliams with non-Hodgkins lymphoma. Dr. Dettore was Mrs. McWilliams' primary care physician. Dr. Joyce is a surgeon to whom Dr. Dettore referred Mrs. McWilliams.

### I. Pleadings and Other Background

A September 28, 1998, mammogram of Mrs. McWilliams' left breast revealed a six-centimeter mass in her left axilla (armpit). The radiologist who performed the mammogram recommended a surgical consultation and, according to the plaintiffs, "strongly recommended" a biopsy, followed by tissue samples. Dr. Dettore, consistent with the recommendation from the radiologist, referred Mrs. McWilliams to Dr. Joyce, a surgeon. Dr. Joyce ordered a CT scan. The October 8, 1998, CT scan revealed two lymph nodes each swollen to two centimeters.

---

[1] Dr. Joyce and SSA will collectively be referred to as "Dr. Joyce," unless otherwise noted.

Dr. Joyce did not biopsy the lymph nodes. Dr. Dettore was informed about the CT scan findings but did not refer Mrs. McWilliams for further treatment. Dr. Joyce saw Mrs. McWilliams again on October 13, 1998, and in February 1999. Mrs. McWilliams remained under Dr. Dettore's care through September 2000.

In 2001, Mr. and Mrs. McWilliams moved to Wisconsin. Sometime thereafter, Mrs. McWilliams was diagnosed with stage IV B-Cell non-Hodgkin's lymphoma. While stage I non-Hodgkins lymphoma may be treated with radiation and may be cured, stage IV requires chemotherapy and cannot be cured. From February 2002 through August 2003, Mrs. McWilliams underwent intensive chemotherapy. Her lymphoma went into remission.

In 2004 or 2005, Mrs. McWilliams was diagnosed with ovarian cancer. The parties agreed Mrs. McWilliams was likely to die from ovarian cancer.

On May 8, 2003, prior to Mrs. McWilliams' ovarian cancer diagnosis, and while she was undergoing chemotherapy for lymphoma, the plaintiffs filed an amended medical malpractice complaint. The complaint alleged Dr. Dettore breached the standard of care by failing to order a biopsy and that Dr. Joyce breached the standard of care by failing to perform a biopsy. The plaintiffs alleged that had a timely biopsy been performed, Mrs. McWilliams would have been diagnosed with stage I non-Hodgkins lymphoma. According to the plaintiffs, "the Defendants kn[ew] or should have known that [Mrs. McWilliams] might be suffering from lymphoma, but negligently failed to do a biopsy to confirm that diagnosis. Instead, the Defendants told [Mrs. McWilliams] not to worry, and that she was all right." The plaintiffs' negligence theory is that Mrs. McWilliams suffered from stage I non-Hodgkins lymphoma at the time her mammogram revealed the six-centimeter mass that prompted her referral to Dr. Joyce.

In the course of discovery, the plaintiffs made clear their intention to present evidence at trial that the ovarian cancer was caused by the heavy doses of chemotherapy Mrs. McWilliams received in the course of her stage IV lymphoma treatment. The plaintiffs theorized that had Mrs. McWilliams' lymphoma been diagnosed and treated at stage I, there would have been no need for the subsequent heavy doses of chemotherapy and the ovarian cancer would not have occurred. The plaintiffs did not amend their complaint to assert this claim.

## II. Expert Witness

### A. *Rule 213 Disclosures*

The plaintiffs retained Dr. Hector Gomez, a hematologist/oncologist, as their sole expert witness. In the plaintiffs' Supreme Court

Rule 213 (210 Ill. 2d R. 213) disclosure filed October 25, 2005, Dr. Gomez set forth three medical opinions: (1) the standard of care required Drs. Dettore and Joyce to order a biopsy in 1998, and had a biopsy been performed, Mrs. McWilliams would have been diagnosed with stage I lymphoma; (2) to a reasonable degree of medical certainty, had Mrs. McWilliams been diagnosed with lymphoma at stage I, and had she been treated with surgical intervention and radiation, and possibly chemotherapy, her lymphoma could have been cured or alleviated; and (3) to a reasonable degree of medical certainty, Mrs. McWilliams' ovarian cancer "could be" the result of the failure to properly treat the stage I lymphoma.

## B. *Deposition*

Dr. Gomez was deposed on November 3, 2005. He testified he attended medical school in Peru and completed a medical residency and fellowship in hematology and oncology in the United States. He is board-eligible in hematology and oncology, but not board-certified.

Ten percent of Dr. Gomez's case load is devoted to internal medicine, while ninety percent is devoted to oncology/hematology. About 65% of that 90% is devoted to oncology. Seventy percent of those patients are referred to Dr. Gomez with a cancer diagnosis. He diagnoses the remaining 30%. He has treated between 80 and 100 non-Hodgkins lymphoma patients in his career.

Dr. Gomez is the chair of the oncology department at Thorek Hospital in Chicago and is on staff at several other community hospitals. He is an associate professor of clinical medicine at Northwestern University and instructs general residents at St. Joseph Hospital.

In his deposition, Dr. Gomez opined that the standard of care required Dr. Joyce "to do something," such as a biopsy or follow-up with additional CT scans. Dr. Gomez emphasized a biopsy should have been performed. Apparently believing Dr. Joyce was a general practitioner instead of a surgeon, Dr. Gomez also criticized Dr. Joyce for failing to obtain a surgical consult.

When asked to state the basis for his opinion that Dr. Joyce deviated from the standard of care, Dr. Gomez answered:

"The standard of care would have been if the patient had these suspicious nodes more than 2 centimeters and it was not an obvious cause to dismiss the patient for such a long time, I would persist and do the biopsy of this patient. If there would have been an early diagnosis, in retrospect, the patient would have had the best chance for a better life, if not cure."

Dr. Gomez stated the standard of care to be, "What I just said, that if a physician sees someone with such a node, the size of the node mainly,

you've got to do something about it, or else chances are you're going to make a mistake." Dr. Gomez agreed with the statement made by Dr. Joyce's counsel that the standard of care is the conduct that a reasonably well-qualified physician would do under similar circumstances.

Dr. Gomez acknowledged he is not board-certified or board-eligible in surgery. He did not complete a surgical residency and has never practiced as a surgeon. He holds no surgical privileges and does not teach surgical residents. He has never performed a biopsy. Dr. Gomez conceded the "ultimate" determination to perform a biopsy is made between the surgeon and the patient. However, a surgeon will generally do a biopsy at the clinician's request. According to Dr. Gomez, no surgeon had ever rejected his biopsy order. Dr. Gomez admitted that where a surgeon, in the course of a consult, declined to perform a biopsy, he would make a second referral to another surgeon.

Dr. Gomez opined that had Mrs. McWilliams been diagnosed with lymphoma in 1998, the lymphoma could have been treated with surgical excision, radiation, and possibly chemotherapy. Dr. Gomez testified that the chemotherapy Mrs. McWilliams would have received in 1998 would have been 95% of the chemotherapy she received to treat her stage IV lymphoma. According to Dr. Gomez, had Mrs. McWilliams been diagnosed in 1998, her life expectancy would have been 15 years.

Dr. Gomez also testified that in his opinion Mrs. McWilliams' lymphoma and the high-dose chemotherapy she received to treat it "greatly enhanced" the likelihood she would suffer from ovarian cancer, but did not "cause" it. When asked to give the basis for his opinion that there was a link between chemotherapy and ovarian cancer, Dr. Gomez explained, couched in reasonable degree of medical certainty language, lymphoma suppresses a patient's immune system and 5% to 10% of immunosuppressed patients receiving high-dose chemotherapy develop a second malignancy, such as leukemia or ovarian cancer. When asked to identify any medical textbooks that supported his position that there is a link between chemotherapy-induced immunosuppression and a secondary malignancy, Dr. Gomez answered, "Based on my experience, it's my opinion because I've read so much that after 30 years I cannot precisely say what—I've read it somewhere."

### III. Pretrial Motions

In October 2006, on the eve of trial, Dr. Dettore and Dr. Joyce filed numerous motions challenging Dr. Gomez's anticipated testimony at trial.

### A. *Causation*

Dr. Dettore and Dr. Joyce each filed a motion *in limine* seeking to

bar Dr. Gomez from opining the chemotherapy Mrs. McWilliams received to treat the stage IV lymphoma caused the ovarian cancer. Drs. Dettore and Joyce argued there was no scientific basis for Dr. Gomez's causation opinion. The circuit court agreed and barred that testimony. Based on the barring of that testimony, Dr. Joyce moved for summary judgment, arguing the plaintiffs were unable to establish proximate cause between Dr. Joyce's alleged negligence and the damages or injuries claimed by Mrs. McWilliams based on her ovarian cancer. The court denied the motion because the plaintiffs were not given notice and an opportunity to respond.

Dr. Dettore also sought to bar Dr. Gomez from testifying that had Dr. Dettore referred Mrs. McWilliams to a second surgeon, the second surgeon would have performed a biopsy, and Mrs. McWilliams would have been diagnosed with lymphoma, treated, and cured. The court reserved ruling on this motion.

### B. *Standard of Care*

Dr. Dettore also sought to bar Dr. Gomez's expert opinion on the standard of care on the ground that Dr. Gomez, an oncologist, was not competent to render expert testimony against Dr. Dettore, a family practitioner. The plaintiffs argued Dr. Gomez's specialty did not preclude his testimony as to the general "standard of care [of] what doctors do in treating a patient with a swollen lymph node." The plaintiffs argued Dr. Gomez's standard of care testimony did not concern the treatment of cancer, but "what every doctor out of medical school should probably know" about treating a patient with swollen lymph nodes.

Dr. Joyce also filed a motion to bar Dr. Gomez from testifying as to the standard of care that applied to his medical treatment. Dr. Joyce argued Dr. Gomez was not qualified to give standard of care opinions because Dr. Gomez was not a surgeon, was not trained in surgery, and held no surgical privileges. The plaintiffs argued that their contention was not that Dr. Joyce deviated from the standard of care in performing surgery, as it was undisputed a biopsy was never performed. Rather, they claimed that Dr. Joyce breached the standard of care in failing to perform the biopsy in light of the mammogram results and the CT scan. According to the plaintiffs, "Dr. Gomez [was] clearly competent to testify that based upon the findings in the mammogram and in the CT scan, that a biopsy should have been performed." In other words, although Dr. Gomez did not perform biopsies, he "kn[ew] when a biopsy should be performed."

At the hearing on October 10, 2006, to address the motions *in limine,* the trial judge noted her doubts as to Dr. Gomez's qualifica-

tions to testify against Dr. Joyce based on her review of Dr. Gomez's *curriculum vitae* and his discovery deposition. The plaintiffs responded that Dr. Gomez had not been asked the appropriate questions to establish his qualifications during his deposition. Rather than rule on Dr. Gomez's qualifications on the record as it stood before her, the trial judge provided the plaintiffs with an opportunity to *voir dire* Dr. Gomez before addressing the defendants' motions *in limine*. Counsel for the defendants and the court suggested postponing jury selection until after the *voir dire*. The plaintiffs' attorney saw no reason to delay jury selection. On October 13, 2006, a jury was selected and sworn. The *voir dire* of Dr. Gomez was scheduled for the following day.

### IV. *Voir Dire* of Dr. Gomez

The *voir dire* of Dr. Gomez took place on Saturday, October 14, 2006. Dr. Gomez testified he went to medical school in Peru, where he learned about normal and abnormal lymph nodes. He described abnormal lymph nodes as "basic medicine" known "throughout the medical community." He also participated in a one-year rotating Peruvian internship in medicine, surgery, obstetrics/gynecology, and pediatrics similar to internships done in the United States. During his internship, Dr. Gomez was taught about abnormal axillary lymph nodes.

Dr. Gomez came to the United States in 1973 and did a year-long internship at Columbus-Cuneo-Cabrini Medical Center in Chicago specializing in medicine, surgery, obstetrics/gynecology, and pediatrics. Doctors who would ultimately become primary care physicians and surgeons participated in the internship. During the internship, Dr. Gomez learned about abnormal lymph nodes and the lymphatic system.

From 1974 through 1977, Dr. Gomez participated in an internal medicine residency program at Columbus-Cuneo-Cabrini Medical Center. The lymphatic system was taught and discussed. Primary physicians and surgeons participated in the residency program. From 1977 through 1979, Dr. Gomez participated in a hematology/oncology fellowship at Northwestern University.

Dr. Gomez testified he had daily contact with surgeons and primary care physicians. He claimed ability to criticize a primary care physician regarding his or her treatment of an abnormal lymph node based on his training. When asked to explain why he thought he could criticize both primary care physicians and surgeons, Dr. Gomez answered:

> "Well, multiple years and throughout my career, which included my training and my 20 years of practice—25 years of practice of medicine, I have been in touch with them.

And I'm still in touch with them in training, and also as a practicing physician. So the answer is, yes, I am very well familiarized with their thinking and training."

## V. Trial Court Rulings

On October 16, 2006, the circuit court reviewed Dr. Gomez's *voir dire* testimony and heard arguments from the parties regarding his qualifications to testify as to the standards of care. The court concluded that Dr. Gomez was qualified to testify against Dr. Dettore, but not qualified to testify against Dr. Joyce. The court found Dr. Gomez failed to "demonstrate his familiarity with the methods, procedures and treatments ordinarily observed by similarly situated physicians such as Dr. Joyce." The court also granted Dr. Dettore's motion *in limine*, on which it had reserved ruling, barring Dr. Gomez's testimony that had Dr. Dettore referred Mrs. McWilliams to a second surgeon, her lymphoma would have been timely diagnosed.

Based on the absence of expert testimony against Dr. Joyce, Dr. Joyce moved for dismissal with prejudice under section 2—619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2—619(a)(9) (West 2006)). Counsel for the plaintiffs responded that barring Dr. Gomez from testifying against Dr. Joyce was "the end of the case" because he was "not going to try this case *** against one doctor when both doctors were guilty of negligence." Counsel indicated he "would rather go to the Appellate Court now than try[ ] this case." Counsel moved for a voluntarily dismissal. The court denied the motion because the jury had been sworn.

The record indicates the parties and the court attempted to devise a means for the plaintiffs to end the entire case, while preserving the plaintiffs' claim against Dr. Dettore, which could have gone forward before the jury. After much discussion on and off the record, the court granted Dr. Joyce's and Dr. Dettore's dismissal motions and dismissed the jury. Written orders to this effect were entered on October 17, 2006, one pertaining to Dr. Joyce, the other to Dr. Dettore.

## VI. Postjudgment Proceedings

In their posttrial motion filed November 13, 2006, the plaintiffs asserted the circuit court erred in barring Dr. Gomez from testifying against Dr. Joyce and in dismissing their case against Dr. Joyce. The plaintiffs argued the *voir dire* of Dr. Gomez established he was competent to testify as to the standard of care that applied to Dr. Joyce in this case. The plaintiffs also argued Dr. Joyce's motion *in limine* was, in effect, an untimely motion for summary judgment without proper notice.

On November 21, 2006, the plaintiffs filed an affidavit by Dr. Go-

mez, to supplement their posttrial motion. In the affidavit, Dr. Gomez averred (1) he had "acquired considerable experience with the standard of care, methods, procedures and treatments relevant to allegations of negligence and the medical condition of Carol McWilliams, as presented in October, 1998, by general or primary physicians and surgeons"; (2) he had "acquired considerable experience with the standard of care, methods, procedures and care and treatment relevant to the allegations against Defendants, Dr. Donald Dettore and Dr. Christopher Joyce concerning a patient in the medical condition presented by Carol McWilliams in 1998"; (3) he "[had] experience with the standard of care, methods, procedures and treatments relevant to the allegations against Dr. Donald Dettore, a general physician" and "against Dr. Christopher Joyce a surgeon"; and (4) he was "knowledgeable with the general medical standard of care with respect to an individual suffering from two (2) two (2) centimeter lymph nodes in the axilla."

Dr. Joyce filed a motion to strike Dr. Gomez's affidavit as untimely.

On November 29, 2006, the circuit court entered an "Agreed Amended Order *** Nunc Pro Tunc" to October 17, 2006, the date the dismissal orders were entered. The *nunc pro tunc* order made clear that the plaintiffs' aim in not responding to the motions by Dr. Dettore was to "receive a single final and appealable order."[2] On February 15, 2007, the circuit court granted Dr. Joyce's motion to strike the affidavit and denied the plaintiffs' posttrial motion. This timely appeal followed.

## ANALYSIS

The plaintiffs assert that as to their case against Dr. Joyce, the circuit court committed four reversible errors: (1) finding Dr. Gomez unqualified to render a standard of care opinion against Dr. Joyce; (2) striking Dr. Gomez's postjudgment affidavit; (3) granting Dr. Joyce's motion *in limine* to bar Dr. Gomez's testimony; and (4) barring Dr. Gomez from testifying to a casual connection between the alleged failure to diagnose stage I lymphoma and Mrs. McWilliams' ovarian cancer. The plaintiffs also assert that the circuit court abused its discretion in not granting their motion to voluntarily dismiss their case once Dr. Gomez was barred from testifying against Dr. Joyce.

---

[2]For a different approach, see *Somers v. Quinn*, 373 Ill. App. 3d 87, 867 N.E.2d 539 (2007). On the eve of trial, the circuit court barred the plaintiff's expert witness. "The parties stipulated that, in the absence of [the expert witness's] testimony, plaintiff would present no evidence on the standard of care. Defendant then moved for a directed verdict, which the trial court granted." *Somers*, 373 Ill. App. 3d at 90.

## I. Dr. Gomez's Qualifications

Generally, in medical negligence cases, a plaintiff must establish, with expert testimony, the applicable standard of care against which the defendant healthcare professional's conduct is measured, a deviation from that standard, and an injury proximately caused by that deviation. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 114-15, 806 N.E.2d 645 (2004).

■ To render standard of care testimony against a medical practitioner, a proffered expert must be scientifically or medically qualified. To be medically qualified, a two-prong showing must be made. First, the expert must be a licensed member of the school of medicine about which he or she proposes to opine, the "licensure" prong. See *Sullivan*, 209 Ill. 2d at 115. Second, the expert must be familiar with the methods, procedures, and treatments that similarly situated physicians as the defendant would ordinarily observe, the "familiarity" prong. See *Sullivan*, 209 Ill. 2d at 115. The showings regarding scientific qualifications are "foundational requirements and form a threshold determination." *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 5, 866 N.E.2d 1243 (2007), citing *Sullivan*, 209 Ill. 2d at 115. "If this threshold determination is not met, the analysis ends and the trial court must disallow the expert's testimony." *Alm*, 373 Ill. App. 3d at 5.

As both Dr. Gomez and Dr. Joyce are medically licensed physicians, this case hinges on the familiarity prong. The circuit court determined Dr. Gomez failed to "demonstrate his familiarity with the methods, procedures and treatments ordinarily observed by similarly situated physicians such as Dr. Joyce." As a consequence, the circuit court granted the dismissal motion by Dr. Joyce.

### A. *Standard of Review*

Our supreme court made clear in *Sullivan* that the scientific qualifications of the proffered expert are "foundational requirements." *Sullivan*, 209 Ill. 2d at 115. A plaintiff's failure to make this threshold showing compels the trial court to "disallow the expert's testimony" and the "analysis ends." *Alm*, 373 Ill. App. 3d at 5. This language in *Alm* suggests that whether the threshold requirements have been met presents a legal question. This language is based on *Sullivan*. To determine whether an expert is qualified to give an opinion on the standard of care, there is a "three-step analysis: the two foundational requirements of licensure and familiarity, and the *discretionary requirement of competency*." (Emphasis added.) *Sullivan*, 209 Ill. 2d at 115. As the supreme court previously made clear in *Jones v. O'Young*, 154 Ill. 2d 39, 607 N.E.2d 224 (1992), the trial court's exercise of

discretion applies *only after* the legal requirements have been met. "Once the foundational requirements have been met, the trial court has discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care." *Jones,* 154 Ill. 2d at 43.

The circuit court expressed doubts regarding Dr. Gomez's qualifications based on its review of his *curriculum vitae* and his deposition testimony. The plaintiffs attributed the deficiency to Dr. Gomez not being asked the right questions, leading to the *voir dire* examination on his qualifications outside the presence of the trial judge. Upon the trial judge's review of the transcript, she determined that the *voir dire* testimony did not establish Dr. Gomez's qualifications and barred his opinion testimony. Because we find no basis to conclude that the circuit court's review of the deposition and *voir dire* transcripts involved an exercise of discretion, we owe no deference to the circuit court's determination that the familiarity-prong requirement has not been met. See *Redmond v. Socha,* 216 Ill. 2d 622, 634, 837 N.E.2d 883 (2005) (an issue "is reviewed under an abuse of discretion standard only when the trial court actually engages in an exercise of discretion"). "The circuit court did not hold an evidentiary hearing, weigh the testimony or assess the credibility of [Dr. Gomez]." *Townsend v. Sears, Roebuck & Co.,* 227 Ill. 2d 147, 154, 879 N.E.2d 893 (2007). The record consists solely of the transcripts of the examinations of Dr. Gomez and his *curriculum vitae.* "When a trial judge bases [her] decision solely on the same 'cold' record that is before the court of review, it is difficult to see why any deference should be afforded to that decision." *Toland v. Davis,* 295 Ill. App. 3d 652, 654, 693 N.E.2d 1196 (1998).

Because the ruling by the circuit court deprived the plaintiffs, pretrial, of presenting their case before a jury, much as a grant of summary judgment or a grant of a motion to dismiss would, both of which are reviewed *de novo,* we decline to review the circuit court's determination that the familiarity prong of the foundation requirements has not been met here as lying within its discretion. We review the circuit court's determination *de novo.*

## B. *Familiarity Prong*

We first note that in their main brief, the plaintiffs take the position that a single standard of care under the circumstances present in this case applies to both Dr. Dettore, a family practitioner, and Dr. Joyce, a board-certified surgeon. It is against this backdrop that we examine whether a sufficient showing of the familiarity prong was made by the plaintiffs to qualify Dr. Gomez to testify against Dr. Joyce.

"The foundational requirements provide the trial court with the information necessary to determine whether an expert has expertise in dealing with the plaintiff's medical problem and treatment." *Jones*, 154 Ill. 2d at 43. It is insufficient for a plaintiff to merely present that "another physician *** would have acted differently from the defendant, since medicine is not an exact science. It is rather a profession which involves the exercise of individual judgment within the framework of established procedures. Differences in opinion are consistent with the exercise of due care." *Walski v. Tiesenga*, 72 Ill. 2d 249, 261, 381 N.E.2d 279 (1978). Generally, expert testimony is required to assist a jury to determine "any lack of necessary scientific skill on the part of the physician." *Walski*, 72 Ill. 2d at 256. Before a medical negligence case requiring expert testimony can reach a jury, a plaintiff must present an expert familiar with the methods, procedures, and treatments that make up the standard of care against which the conduct of the defendant doctor may be measured. *Walski*, 72 Ill. 2d at 255. Only with the presentation of such expert testimony can a plaintiff "prove that, judged in the light of these standards, the doctor was unskillful or negligent and that his want of skill or care caused the injury to the plaintiff." *Walski*, 72 Ill. 2d at 256.

To satisfy the familiarity prong, the plaintiffs had to demonstrate that Dr. Gomez, an oncologist that orders biopsies of swollen lymph nodes and treats cancer patients, had familiarity with the generally accepted standard of care or skill required to determine when a biopsy, a surgical procedure, under the circumstances presented by Mrs. McWilliams, should be performed.

The plaintiffs were given two opportunities to demonstrate Dr. Gomez's familiarity with the standard of care applicable to Dr. Joyce. At the pretrial motions hearing, the plaintiffs acknowledged that Dr. Gomez had not been asked the appropriate questions to establish his qualifications during his deposition. The trial judge provided the plaintiffs with an opportunity to *voir dire* Dr. Gomez. In their main brief, the plaintiffs do not include an excerpt from the *voir dire* examination of Dr. Gomez that they claim satisfied the familiarity prong regarding the standard of care applicable to Dr. Joyce. Rather, the plaintiffs, in concluding their argument on this issue, assert "the standard of care regarding the care, treatment and management of [the plaintiff's] condition is the same for all physicians involved, keeping in mind that the radiologist at [the hospital where the mammogram was taken] warned both doctors that in his opinion a biopsy was necessary."

We look to the cases that address the familiarity prong to determine whether the plaintiffs made a sufficient showing to qualify

Dr. Gomez to allow the case to go forward before a jury. In *Northern Trust Co. v. Upjohn Co.*, 213 Ill. App. 3d 390, 572 N.E.2d 1030 (1991), *Hubbard v. Sherman Hospital*, 292 Ill. App. 3d 148, 153, 685 N.E.2d 648 (1997), and *Alm*, the familiarity prong was not established. In *Silverstein v. Brander*, 317 Ill. App. 3d 1000, 740 N.E.2d 357 (2000), we found the opposite. We begin with the principal case the plaintiffs contend supports their position.

In *Silverstein*, we reversed the circuit court's ruling that the plaintiff's expert, an internist, was unqualified to criticize the defendant physiatrist. The case involved the treatment of the plaintiff with the drug Indocin after hip surgery. The proffered expert's testimony averred that the defendant doctor "should have recognized problems from the use of Indocin for a patient with a history of peptic ulcers complaining of nausea." *Silverstein*, 317 Ill. App. 3d at 1002. It was alleged that "[t]he continued use of Indocin caused plaintiff's [new] ulcer." *Silverstein*, 317 Ill. App. 3d at 1002. The plaintiff's expert did not offer any criticism of the physical therapy rendered by the defendant. The expert criticized the medical management of the plaintiff regarding the continued administration of Indocin once the plaintiff complained of nausea. *Silverstein*, 317 Ill. App. 3d at 1002. While the defense attorneys sought to bar testimony of the plaintiff's expert as to the alleged violation of the standard of care, based on the trial judge's ruling, it is clear that the challenge was directed at the plaintiff's expert's alleged lack of "familiarity with the standard of care for physiatrists." *Silverstein*, 317 Ill. App. 3d at 1003. In reversing, we noted the plaintiff's expert "had considerable experience with Indocin, and he testified that all physicians, including physiatrists, know of Indocin's effects" on a patient with peptic ulcers. *Silverstein*, 317 Ill. App. 3d at 1007. We found the plaintiff's expert sufficiently familiar with the adverse effects of Indocin and the medical management standard of care for the administration of Indocin, which required "all physicians, including physiatrists" to recognize "that a patient with a history of peptic ulcers is especially vulnerable to those effects." *Silverstein*, 317 Ill. App. 3d at 1007-08.

Relying on the medical management reference in *Silverstein*, the plaintiffs contend in their main brief that "Dr. Gomez did not criticize Dr. Joyce for surgical procedure, but disapprove[d] of [Dr. Joyce] for [his] medical management." According to the plaintiffs, Dr. Gomez opined "[Dr. Joyce] should know that [a] lymph node over one-centimeter in the axilla is abnormal. Therefore since [Dr. Joyce] knew [Mrs. McWilliams] suffered from two very abnormal lymph nodes, [Dr. Joyce was] required to administer appropriate medical care, consisting of telling her of her ailment, recommend biopsy, and further medical care."

While *Silverstein* may fall under the rubric of "medical management," the role medical management played in the case turned on the claim of negligence tied to the patient's care. In *Silverstein,* the claim was the physiatrist was negligent in failing to recognize symptoms connected to the administration of Indocin to a patient that had peptic ulcers. The plaintiff's expert testimony was that "all physicians, including physiatrists," know of and are expected to recognize such symptoms. Thus, the proffered expert in *Silverstein* testified to sufficient familiarity with the controlling standard of care to which "all physicians, including physiatrists," would be held on the claim of negligence regarding the administration of Indocin to the plaintiff.

■ Here, the plaintiffs' negligence claim against Dr. Joyce is that he failed to perform a biopsy on Mrs. McWilliams in light of her abnormal lymph nodes disclosed in the mammogram and the CT scan. However, it is beyond contention that Dr. Gomez has never performed a biopsy, holds no surgical privileges and does not teach surgical residents. Dr. Gomez conceded in his discovery deposition that disagreements with surgeons may arise on whether to perform a biopsy.

"Q. If the surgeon disagrees with you, then you go out and get another surgeon?

A. I get another opinion, and you know, until I get this done."

In fact, during his discovery deposition, Dr. Gomez wrongly criticized Dr. Joyce for not having referred Mrs. McWilliams to a surgeon.

Dr. Gomez's admission that he and the surgeon to whom he might refer a patient presenting abnormal lymph nodes, like Mrs. McWilliams here, might disagree, leads us to conclude that the decision whether to perform a biopsy is inherently tied to a surgeon's training. The plaintiffs' claim is that Dr. Joyce should have performed a biopsy. It is simply not accurate to state that because no biopsy was performed, Dr. Gomez's criticism of Dr. Joyce is not based on factors that a surgeon would consider in deciding whether to perform surgery. Whether to perform a biopsy (to cut or not to cut) is not a decision that "all physicians, including [oncologists]," know as counsel for the plaintiffs argues. Nor did Dr. Gomez ever testify to such a claim. In fact, such a claim may be foreclosed to Dr. Gomez when he acknowledged that his own practice is to refer patients with abnormal lymph nodes to surgeons and conceded that the "ultimate" decision whether to perform a biopsy is made between the surgeon and the patient. We reject the plaintiffs' argument that the case against Dr. Joyce concerned "what every doctor out of medical school should probably know."

More to the point, nowhere do we find any testimony by Dr. Go-

mez as to the standard of care to which Dr. Joyce, a surgeon, was bound to adhere. Although Dr. Gomez's *voir dire* testimony established his expertise with abnormal lymph nodes, his testimony did not link this expertise to the performance of a biopsy. Dr. Gomez's testimony, as it stands before us, is indistinguishable from the testimony of the plaintiff's expert found insufficient in *Walski*. The plaintiff's expert "at no time testified that there was a generally accepted medical standard of care or skill which required the [medical procedure] under the circumstances. *** Absent is any statement of a standard [the defendant doctor] was required to follow in this case." *Walski*, 72 Ill. 2d at 259-60. Our conclusion is the same here.

It was incumbent upon the plaintiffs to demonstrate the standard of care or skill that would dictate when a biopsy would be medically necessary. On the record before us, we are compelled to conclude Dr. Gomez was not qualified to testify against Dr. Joyce, a board-certified surgeon, as to his decision not to perform a biopsy.[3]

Our conclusion is supported by the three cases, referenced above, where the familiarity prong was found not to have been satisfied. In *Northern Trust*, we concluded the plaintiff's expert, board-certified in internal medicine and emergency medicine and the director of emergency services at Northwestern Memorial Hospital, was unqualified to testify to the standard of care that applied to the use of the drug Prostin in the context of an abortion procedure, which, according to the complaint, caused the patient to suffer cardiac arrest, resulting in brain injury. The plaintiff's expert had never worked in an obstetrics or gynecology ward, had never performed an abortion, had never used Prostin, had never seen Prostin used, and had never observed a patient's reaction to Prostin. Based on these facts, we concluded the expert "was not qualified to give an opinion on [the standard of care] since he could not know what was customary practice" for someone in the defendant's position. *Northern Trust*, 213 Ill. App. 3d at 407.

In *Hubbard*, the pertinent appellate review concerned the disallowance of testimony by the plaintiff's expert that was critical of the defendant surgeon's "performance of the actual surgery." *Hubbard*, 292 Ill. App. 3d at 153. The *Hubbard* court agreed with the trial court that the plaintiff's expert was not qualified to testify against the emergency room surgeon. We noted that the plaintiff's expert "provided no information that he had ever actually performed an ap-

---

[3]Though not a part of our analysis, Dr. Joyce's discovery responses indicate that because he could not "palpate the mass," the mammogram results and the CT scan were insufficient to justify the surgical procedure a biopsy would entail, a conclusion supported by his own lineup of experts.

pendectomy himself or that he holds or held surgical privileges at any hospitals. Accordingly, the trial court properly precluded his testimony concerning surgery and related topics, such as the time of the surgery and presurgical testing." *Hubbard*, 292 Ill. App. 3d at 155.

In *Alm*, a two-month-old infant died the day after receiving plastic surgery to fix a cleft lip and palate. The parents sued the plastic surgeons and anesthesiologist, alleging they failed to properly monitor the infant during surgery and improperly discharged her following surgery. The circuit court barred the plaintiffs' proposed expert, a pathologist. In affirming, we found the expert's deposition testimony failed to establish he had any experience with the methods, procedures, and treatments at issue—those pertaining to the postoperative care of infants and "discharge decisionmaking." *Alm*, 373 Ill. App. 3d at 6. The expert's training and experience involved the examination of tissue samples from the living and the deceased; he had not evaluated a live patient in about 20 years and had not treated a pediatric patient for even longer. The expert testified he " 'deals with' " plastic surgeons but he did not consider himself an expert in plastic surgery. *Alm*, 373 Ill. App. 3d at 6. His only training in anesthesiology was part of a rotation while a resident approximately 25 years earlier. He was unable to recall ever discharging a patient and could not identify the applicable standard of care.

As in *Alm*, Dr. Joyce's decisionmaking is central to the plaintiffs' negligence claim. The plaintiffs' claim against Dr. Joyce is based on his decision not to perform a biopsy. Before Dr. Gomez could be allowed to criticize Dr. Joyce's medical judgment before a jury, Dr. Gomez first had to demonstrate his experience with the methods, procedures and treatments at issue—those pertaining to when a biopsy should be performed. Dr. Gomez had no experience in such decisionmaking. As in *Northern Trust* and *Hubbard*, Dr. Gomez did not know the customary practice for a surgeon regarding the decision whether to perform the surgical procedure of a biopsy. While we do not read *Hubbard* to hold that only a surgeon can provide critical testimony against another surgeon, it is clear that before critical testimony based on professional standards may be allowed, a plaintiff's proffered expert must be familiar with the matters that a reasonably qualified surgeon would consider in the course of carrying out his medical duties.

We emphasize that our holding does not rest on Dr. Gomez not being a surgeon. We agree with the plaintiffs' repeated contention that one need not be a surgeon to criticize a surgeon. See *Jones*, 154 Ill. 2d at 43 ("[w]hether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant"). *Silverstein* demonstrates this as well. Nonetheless, before

a plaintiff's expert may step into the shoes of a defendant doctor to assess his medical skills, the plaintiff's expert must demonstrate he is familiar with the medical standard against which the defendant doctor's medical judgment must be measured. While it is not beyond the realm of possibility that an oncologist may be capable of criticizing a surgeon's decision to forego a biopsy, Dr. Gomez's testimony did not demonstrate the necessary expertise.

As a matter of law, the plaintiffs failed to meet the familiarity-prong threshold of the foundational requirements. *Sullivan*, 209 Ill. 2d at 115. The plaintiffs having failed to meet this threshold determination, our "analysis ends and the trial court [was correct to] disallow the expert's testimony." *Alm*, 373 Ill. App. 3d at 5. Accordingly, the circuit court did not err in barring Dr. Gomez from testifying as an expert against Dr. Joyce.[4]

## II. Remaining Claims of Reversible Error

Because the remaining three claims of reversible error as to the plaintiffs' case against Dr. Joyce turn on Dr. Gomez's anticipated court testimony against Dr. Joyce and we find Dr. Gomez was properly barred from rendering expert testimony against Dr. Joyce, our resolution of the first issue is dispositive to the other three as well. Nonetheless, we briefly address the remaining three claims of reversible error pertaining to the case against Dr. Joyce.

### A. *Motion in Limine*

■ We are unpersuaded that the motion *in limine* filed by Dr. Joyce somehow came as a surprise to the plaintiffs. The plaintiffs were given two opportunities to establish the foundational requirements to qualify Dr. Gomez. The second opportunity came after Dr. Joyce's motion *in limine* challenging Dr. Gomez's qualifications was filed. That the grant of the motion *in limine* laid the basis for the section 2—619(a)(9) motion to dismiss does not make the motion *in limine* or the motion to dismiss the equivalent of a motion for summary judgment, for notice purposes. "If we accepted plaintiffs' argument that the motion to dismiss was an untimely motion for summary judgment and reversed the trial court, plaintiffs would ultimately find themselves in the same position they are in now. With no expert [witness] to prove [standard of care], the court would grant a directed verdict for [Dr. Joyce], after having had to waste both its and the parties' time,

---

[4]While the dissent contends the familiarity prong showing was established, unlike in *Silverstein*, neither the plaintiffs nor the dissent quotes Dr. Gomez's "precise testimony" that in their judgment qualifies Dr. Gomez "as an expert in the kind of treatment criticized." *Silverstein*, 317 Ill. App. 3d at 1007.

money and energy on an unnecessary proceeding. '[T]he law does not require the doing of a useless act.' " *Seef v. Ingalls Memorial Hospital,* 311 Ill. App. 3d 7, 20, 724 N.E.2d 115 (1999), quoting *Stone v. La Salle National Bank,* 118 Ill. App. 3d 39, 45, 454 N.E.2d 1060, 1065 (1983).

## B. *Affidavit*

■ The plaintiffs argue the circuit court had discretion to consider the affidavit, which they assert "certainly established Dr. Gomez's qualifications and familiarity with the standard of care concerning both physicians."[5]

While we do not disagree that the circuit court may have had discretion to consider the affidavit, we find the affidavit adds nothing to Dr. Gomez's deposition and *voir dire* testimony. The postjudgment affidavit fails to set forth any specific facts to demonstrate Dr. Gomez's expertise to criticize a surgeon for failing to perform a biopsy. Dr. Gomez's affidavit contains nothing more than conclusory statements. Accordingly, it was properly rejected by the circuit court.

## C. *Causal Connection to Ovarian Cancer*

■ The plaintiffs' final contention involving the case against Dr. Joyce is that under the "loss-of-chance doctrine," the circuit court erred when it barred Dr. Gomez from testifying to a causal connection between the defendants' alleged failure to timely diagnose Mrs. McWilliams' non-Hodgkins lymphoma and her development of ovarian cancer. The plaintiffs' loss-of-chance argument is not clear. The loss-of-chance doctrine is related to the cause-in-fact component of the proximate cause element of a negligence case. See, *e.g., Scardina v. Nam,* 333 Ill. App. 3d 260, 269, 775 N.E.2d 16 (2002).

Drs. Joyce and Dettore assert that a loss-of-chance theory was never raised below and was never ruled upon by the circuit court. Our review of the record confirms this and, thus, this contention is waived. See, *e.g., Haudrich v. Howmedica, Inc.,* 169 Ill. 2d 525, 536, 662 N.E.2d 1248 (1996) (issues not raised below are forfeited on appeal).

Waiver aside, we agree with the circuit court that more was required than a Rule 213 disclosure to support this claim. The circuit court ruled that Dr. Gomez's causation theory—that Mrs. McWilliams' ovarian cancer "could be" the result of her treatment for stage IV lymphoma—was not generally accepted under *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). On appeal, the plaintiffs do not contend this ruling was erroneous, which comes as no surprise given that Dr. Gomez cited no scientific support for his position. See, *e.g., Ruffin v.*

---

[5]No party disputes the trial court's finding that Dr. Gomez was qualified to testify against Dr. Dettore.

*Boler*, 384 Ill. App. 3d 7, 23-24, 890 N.E.2d 1174, 1188 (2008) (reliability and general acceptance may be established under *Frye* where the theory has been published in scientific literature).

Finally, there is no reason to reach the proximate cause issue of the loss-of-chance doctrine when the plaintiffs failed to establish the applicable standard of care. See *Alm*, 373 Ill. App. 3d at 5 (if threshold requirements have not been met, expert testimony must be disallowed).

## III. Voluntary Dismissal

■ Finally, the plaintiffs argue the circuit court abused its discretion in not granting their motion to voluntarily dismiss their action once Dr. Gomez was found unqualified and that notions of equity require us to reverse the circuit court's order. Upon meeting statutory requirements, a plaintiff has the nearly unfettered right to voluntarily dismiss his or her case any time prior to the commencement of trial. 735 ILCS 5/2—1009(a) (West 2006); *Valdovinos v. Luna-Manalac Medical Center, Ltd.*, 328 Ill. App. 3d 255, 265, 764 N.E.2d 1264 (2002).

Here, trial commenced when the jury was selected, which occurred prior to the plaintiffs' motion for voluntary dismissal. *Kahle v. John Deere Co.*, 104 Ill. 2d 302, 308, 472 N.E.2d 787 (1984), citing *Wilhite v. Agbayani*, 2 Ill. App. 2d 29, 33, 118 N.E.2d 440 (1954) (trial commenced when the jurors were examined and sworn). Notions of equity do not persuade us to overturn the lower court's order where the record shows it was the plaintiffs' counsel who insisted on impaneling the jury prior to Dr. Gomez's *voir dire*. The circuit court and defense counsel urged putting off jury selection until after Dr. Gomez was reexamined. The plaintiffs' counsel, as master of his case, saw no reason to delay jury selection. As the plaintiffs' position was acceded to, we see no basis to overturn the circuit court's denial of the request for a voluntary dismissal. The plaintiffs have made no showing of an abuse of discretion by the circuit court in denying their motion for a voluntary dismissal.

## CONCLUSION

As a matter of law, the circuit court correctly ruled that Dr. Gomez was not qualified to render a standard of care opinion against Dr. Joyce and, therefore, the circuit court properly granted Dr. Joyce's motion *in limine*. The circuit court did not abuse its discretion in striking Dr. Gomez's postjudgment affidavit and barring Dr. Gomez from testifying to any purported link between stage I lymphoma and ovarian cancer. Finally, the circuit court acted within its discretion in

denying the plaintiffs' motion to voluntarily dismiss their case. The judgment of the circuit court is affirmed.

Affirmed.

JUSTICE WOLFSON, specially concurring:

I write this special concurrence only to express my disagreement with a small portion of the majority opinion.

We should apply an abuse of discretion standard to the trial court's decision to bar Dr. Gomez's testimony against Dr. Joyce. To reach the conclusion that Dr. Gomez was not qualified to testify the trial court had to review Dr. Gomez's deposition and *voir dire* testimony. The trial court weighed the testimony and made an evidentiary ruling. It was not a ruling based on "documentary evidence," as it was in *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 154 (2007).

PRESIDING JUSTICE ROBERT E. GORDON, dissenting:

I respectfully dissent.

The trial judge in this case made two incorrect rulings that would require this court to reverse the trial court. First, when the trial court denied Dr. Detorre's motion *in limine* to bar plaintiff's expert, Dr. Gomez, from testifying against him on standard of care, the trial court abused its discretion in granting Dr. Detorre's motion to dismiss the case with prejudice[6] when plaintiff did not want to proceed further. "If a trial judge dismisses a plaintiff's cause of action as a result of a refusal to proceed with trial due to the unavailability of a necessary witness, the proper order of dismissal is one for want of prosecution." *Farrar v. Jacobazzi*, 245 Ill. App. 3d 26, 33 (1993).

Plaintiff complains in his brief and oral argument that it is unfair for the defense to file motions *in limine* to bar her sole expert witness on the day the case is assigned for immediate trial. Yet, not only is there no rule of law that prohibits that practice, lawyers normally file their motions to bar at that time, and the trial bar is well aware of

---

[6]Plaintiff's failure to satisfy the statutory requirements of notice and costs was not an absolute bar to a voluntary dismissal. See 387 Ill. App. 3d at 852, citing *Valdovinos*, 328 Ill. App. 3d at 265. In *Valdovinos*, this court held that we would excuse "plaintiffs' failure to strictly comply with the requirements of section 2—1009" where no prejudice resulted. *Valdovinos*, 328 Ill. App. 3d at 267-68. In *Valdovinos*, we held that no prejudice resulted, where defendants "were given an opportunity to respond to the plaintiffs' motion despite the lack of notice," and where the court's dismissal order directed plaintiffs to subsequently "pay costs and expenses to the defendants." *Valdovinos*, 328 Ill. App. 3d at 267-68.

that process. If a lawyer feels that he or she needs that disposition to occur earlier, a motion judge in Cook County could require a party to file such motions earlier on plaintiff's motion to do so. Plaintiff in this case made no motion to do so.

However, in a medical negligence case, when a plaintiff's sole expert witness is barred from testifying against a defendant physician at the last moment, the plaintiff has no expert to proceed in order to make a *prima facia* case and the circumstances are the same as the unavailability of a necessary witness.[7] Thus, the dismissal in the case at bar should have been "for want of prosecution." "It is established law in Illinois that a trial judge does not have the power to dismiss a cause of action for want of prosecution with prejudice." *Farrar v. Jacobazzi*, 245 Ill. App. 3d at 34; see also *Kraus v. Metropolitan Two Illinois Center*, 146 Ill. App. 3d 210, 212 (1986) ("a dismissal for want of prosecution *** is not an adjudication on the merits, does not prejudice the case of the party against whom it is entered, and does not bar a subsequent suit on the same issues"). Thus, the order should have been entered, without prejudice.

Second, the trial court erred in barring Dr. Gomez from testifying against Dr. Joyce, both as to standard of care[8] and to causation. The trial court first determined that Dr. Gomez failed to "demonstrate his familiarity 'with the methods, procedures and treatments ordinarily observed by' similarly situated physicians such as Dr. Joyce." *McWilliams v. Detorre*, 02—L—12242 (Cook Co. Cir. Ct. October 17, 2006), quoting *Alm v. Loyola*, 373 Ill. App. 3d at 5. I agree with the majority that to satisfy the familiarity prong, the plaintiff had to demonstrate that Dr. Gomez, an oncologist, had familiarity with the generally accepted standard of care required to determine when a cancer biopsy should be performed. However, this court's decision in *Silverstein*—

---

[7]The majority is at a loss about how to properly characterize the trial court's order regarding the motion *in limine*. On the one hand, the majority opinion states that our review of this order should be *de novo*, because the order was tantamount to a summary judgment order. 387 Ill. App. 3d at 844. On the other hand, the majority opinion states later that the motion *in limine* was not "the equivalent of a motion for summary judgment," for notice purposes. 387 Ill. App. 3d at 850.

[8]The majority stated: "In their main brief, the plaintiffs do not include an excerpt from the *voir dire* examination of Dr. Gomez that they claim satisfied the familiarity prong regarding the standard of care applicable to Dr. Joyce." 387 Ill. App. 3d at 845. That statement is factually wrong. Plaintiffs include an extensive excerpt from the *voir dire* examination of Dr. Gomez on page 14 of their brief, which they state shows that Dr. Gomez was "familiar" with the standard of care required of surgeons.

and the long line of cases like it—directs the outcome in the case at bar. *Silverstein*, 317 Ill. App. 3d at 1007 ("The cases instruct us to look to the expert's precise testimony and determine whether he qualifies as an expert in the kind of treatment criticized"); *Rosenberg v. Miller*, 247 Ill. App. 3d 1023, 1029, 1030-31 (1993) (a dentist was qualified to testify against a periodontist, where the deviation concerned something that "all dentists" should know); *Gorman v. Shu-Fang Chen, M.D., Ltd.*, 231 Ill. App. 3d 982, 983-85, 988 (1992) (a plastic surgeon was qualified to testify against an orthopedic surgeon concerning his failure, in light of plaintiff's swollen jaw, to X-ray and hence diagnose a jaw fracture); *Rock v. Pickleman*, 214 Ill. App. 3d 368, 370, 374 (1991) (an internist was qualified to testify against a surgeon concerning the surgeon's postoperative management of the patient, because proper management did not require knowledge of surgical procedures); *Smock v. Hale*, 197 Ill. App. 3d 732, 739-40 (1990) (a doctor who was an expert in Crohn's disease was qualified to testify against a family practitioner who supervised the pregnancy of a patient with Crohn's disease); *Petkus v. Girzadas*, 177 Ill. App. 3d 323, 328 (1988) (a cardiologist was qualified to testify against an orthopedic surgeon concerning "the minimum standards applicable to any physician rendering post-operative care" to a patient with a heart condition).

In *Silverstein*, we reversed the trial court's determination that plaintiff's expert, an internist, was unqualified to criticize the defendant physiatrist concerning her care and treatment of plaintiff, with the medication Indocin, after plaintiff's hip replacement surgery. *Silverstein*, 317 Ill. App. 3d at 1007-08. The expert's testimony concerned defendant's medical management of plaintiff after surgery and defendant's prescription of the drug Indocin—areas in which the expert had considerable experience. *Silverstein*, 317 Ill. App. 3d at 1007-08. The negligence claim turned on whether the defendant physiatrist should have recognized that plaintiff had symptoms of an ulcer after taking Indocin. *Silverstein*, 317 Ill. App. 3d at 1002. We found the expert sufficiently familiar with the adverse effects of the medication—symptoms which "all physicians, including physiatrists" knew of, and were expected to recognize. *Silverstein*, 317 Ill. App. 3d at 1007.

The majority attempts to distinguish *Silverstein* from this case, claiming that a biopsy is a surgical procedure and that only another surgeon can testify about whether a surgeon breached the standard of care: (1) by failing to perform a biopsy, in light of plaintiff's abnormal lymph nodes, disclosed in both the mammogram and the CT scan; (2) by failing to inform the patient about the findings of both her mam-

mogram and her CT scan; and (3) by failing to suggest to plaintiff that she should obtain a second opinion concerning the biopsy. It is well established that an expert does not have to be in the same specialized field, in order to render an opinion about the appropriate standard of care. *Alm*, 373 Ill. App. 3d at 5 ("a plaintiff's medical expert need not have the same specialty or subspecialty as the defendant doctors"), citing *Jones v. Young*, 154 Ill. 2d 39, 43 (1992); see also 735 ILCS 5/8—2501(a) (West 2006) (board certification in the same specialty is only one factor for a trial court to consider). Even the radiologist at the hospital where the mammogram was taken warned both defendant physicians that a biopsy was necessary. In *Silverstein*, plaintiff's expert was not in the same specialized field as the defendant physician, but had "considerable" experience with the medication that was prescribed. *Silverstein*, 317 Ill. App. 3d at 1007. In the case at bar, plaintiff's expert was not in the same specialty field as the surgeon, but he is a cancer specialist (oncologist) and knew from his training and daily dealings with surgeons that a biopsy was required under the applicable standard of care for *all* physicians. *Silverstein*, 317 Ill. App. 3d at 1007 ("all physicians" are expected to know certain things). The majority states that "neither the plaintiffs nor the dissent quotes Dr. Gomez's 'precise testimony' that in their judgment qualifies Dr. Gomez 'as an expert in the kind of treatment criticized.' " 387 Ill. App. 3d at 850 n.4, quoting *Silverstein*, 317 Ill. App. 3d at 1007. The precise testimony, quoted by plaintiffs in their briefs, is Dr. Gomez's description of his training and experience, as well as his almost daily dealings with surgeons, concerning questions just like the one at issue here, namely, when to do a biopsy. In addition, Dr. Gomez took two rotating internships that included surgery, and it is common knowledge that surgeons confer with oncologists on cancer matters. It is common knowledge in today's world that the only sure way to determine whether tissue is cancerous is to take a biopsy. Anything less is no more than Russian roulette. *Somers*, 373 Ill. App. 3d at 90 (if " 'the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson,' " expert medical testimony is not required to establish either the standard of care or a deviation from it), quoting *Sullivan*, 209 Ill. 2d at 112, quoting *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986). But even more important, one does not need an expert to inform a jury that a patient has a right to be advised of a physician's findings, especially abnormal lymph nodes. The fact that this oncologist did not perform biopsies does not make him unqualified as an expert; it only goes to the weight of his testimony.

The majority based its opinion on Dr. Gomez's "concession" that

surgeons may disagree with him and that the surgeon, with the patient, is the "ultimate" decisionmaker. 387 Ill. App. 3d at 838, 847. This description distorts Dr. Gomez's actual testimony.[9] *Rock*, 214 Ill. App. 3d at 373 (a doctor's statements must be read in context). Dr. Gomez testified *repeatedly* that no surgeon had ever disagreed with his assessment about the need to do a biopsy. When opposing counsel asked, "[a]nd sometimes the surgeons do not do the biopsy," Dr. Gomez replied emphatically, "[n]ot in any case [where] I've been present." When opposing counsel asked what Dr. Gomez would do if, in a hypothetical case, some surgeon in the future did disagree, Dr. Gonzalez testified that, in that event, he would obtain a second opinion. The "ultimate" language quoted by the majority originally came from opposing counsel. Counsel asked: "The ultimate decisionmaker between whether to perform a biopsy or not, that's between the surgeon and the patient, correct?" Dr. Gomez answered: "The ultimate, yeah, supposed to." Dr. Gomez subsequently clarified his answer, explaining that the patient was the ultimate decisionmaker. Dr. Gomez stated: "I want to add to the last statement about the biopsy, the patient in this situation has to be agreeable to have the biopsy, approved by him. You know, I would never make a decision for my patient."

The majority then concluded that, since Dr. Gomez "conceded" in his discovery deposition that the "ultimate" determination to perform a biopsy is made between the surgeon and the patient, Dr. Gomez cannot opine that the failure to perform a biopsy is a breach of the standard of care, because he is not a surgeon. The majority and the trial court apparently believe that there is some "magic" in the decisionmaking process of a surgeon that only another surgeon can testify to. A biopsy is no more than a cutting and taking of a sample of tissue to discern cancer and its severity. When Dr. Gomez testified that the "ultimate" determination to perform a biopsy is made between the surgeon and the patient, he was referring to the fact that the patient must consent to the process; and in order to consent, the patient must be made aware of the findings that suggest a biopsy—findings that

---

[9]The majority also stated that "Dr. Gomez cited no scientific support for his position" concerning causation. 387 Ill. App. 3d at 851. However, what Dr. Gomez actually stated during his discovery deposition was that his opinion was based on his extensive reading and experience over the last 30 years, and that he could not then recall precisely the names of texts. His opinion to a reasonable degree of medical certainty was that there was no question that the patient's immune system had been compromised and that the immunosuppression enhanced her chances for developing a secondary malignancy.

this patient was never told, according to plaintiffs' account of what occurred in this case.

Since the trial court erred in granting the motion *in limine*, we must vacate the dismissal order, which resulted from this error. *Rock*, 214 Ill. App. 3d at 377 (since the summary judgment order resulted from the trial court's error in striking plaintiff's medical expert, the summary judgment order had to be reversed).